**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ROCHELLE LAMBKIN, on behalf of herself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR A JURY TRIAL** |
| SUPERIOR AIR-GROUND AMBULANCE SERVICE, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Rochelle Lambkin ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby alleges the following against Superior Air-Ground Ambulance Service, Inc. ("Defendant") as an individual and on behalf of all others Similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.       Plaintiff brings this class action lawsuit against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former Defendant patients' (collectively defined herein as the "Class" or "Class Members") personally identifiable information ("PII") and protected health information ("PHI"), including names, dates of birth, Social Security numbers, driver's licenses, health and health insurance information, and financial data (collectively, the "Private Information") from cybercriminals.

2.       Defendant is a corporation that provides ambulance and other healthcare-related

1

travel services and currently has "over 3,000 employees and provide[s] EMS in five states."[1]

3.     Plaintiff and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect against disclosure was targeted, compromised, and unlawfully accessed due to the Data Breach.

4.     As part of its business, Defendant collects a treasure-trove of data from their patients, including highly sensitive Private Information.

5.     Healthcare providers that handle Private Information have an obligation to employ reasonable and necessary data security practices to protect the sensitive, confidential and personal information entrusted to them.

6.     This duty exists because it is foreseeable that the exposure of such Private Information to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, medical and financial identity theft, invasion of their private health matters and other long-term issues.

7.     The harm resulting from a data and privacy breach manifests in several ways, including identity theft and financial and medical fraud, and the exposure of a person's Private Information through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives.

8.     Mitigating that risk requires individuals to devote significant time, money and other resources to closely monitor their credit, financial accounts, health records and email accounts, as well as to take a number of additional prophylactic measures.

9.     In this instance, all of that could have been avoided if Defendant had employed

---

[1] https://www.superiorambulance.com/about-us/ (last visited June 7, 2024).

reasonable and appropriate data security measures.

10.     As a result of the Data Breach, Defendant announced that their patients' Private Information that had been entrusted to Defendant had been compromised, affecting at least 858,000 individuals (the "Data Breach").[2]

11.     The breach appears to have involved the divulgence of Private Information of Defendant's patients including their: name, contact information (e.g., email address, phone number), date of birth, social security number, driver's license or other government identification, financial details (e.g., bank account number and/or credit card details), health insurance information, medical records and information about medical history and/or associated conditions, and/or unique identifiers to associate individuals with Superior Air-Ground Ambulance Service (e.g., medical record number).

12.     Moreover, on information and belief, Defendant failed to mount any meaningful investigation into the breach itself, the causes, or what specific information of Plaintiff and the proposed Class was lost to criminals.

13.     Defendant's "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach has been severely diminished.

14.     As a direct and proximate result of Defendant's failure to implement and to follow basic security procedures, Plaintiff's and Class Members' PII and PHI is now in the hands of cybercriminals.

---

[2] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 7, 2024).

3

15.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, Private Information being disseminated on the dark web, and similar forms of criminal mischief, risk which may last for the rest of their lives.

16.     Plaintiff and Class Members have also suffered concrete injuries in fact including, but not limited to, lost or diminished value of Private Information, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, loss of benefit of the bargain, lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails.

17.     Consequently, Plaintiff and Class Members must devote substantially more time, money and energy to protect themselves, to the extent possible, from these crimes. *See McMorris v. Lopez*, 995 F.3d 295, 301 (2d Cir. 2021) (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) ("Why else would hackers break into a store's database and steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities.")).

18.     Plaintiff, on behalf of herself and all others similarly situated, therefore brings claims for (i) Negligence; (ii) Breach of Implied Contract; (iii) Breach of Fiduciary Duty; (iv) Invasion of Privacy; (v) Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 *et seq.* ("ICFA"); (vi) Unjust Enrichment and (vii) Declaratory Judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably necessary and appropriate data security practices to safeguard the Private Information in Defendant's custody in order to prevent incidents like the Data Breach from occurring in the future.

## PARTIES

*Plaintiff Lambkin*

19.     Plaintiff Rochelle Lambkin is, and at all times mentioned herein, was an individual citizen residing in Highland Park, Michigan.

20.     Plaintiff understandably and reasonably believed and trusted that her Private Information provided to Defendant would be kept confidential and secure and would be used only for authorized purposes.

*Defendant Superior Air-Ground Ambulance Service, Inc.*

21.     Defendant Superior Air-Ground Ambulance Service, Inc. is a corporation organized under state laws of Illinois with its principal place of business located in Elmhurst, Illinois.

22.     Defendant is a corporation that provides ambulance and other healthcare-related travel services and currently has "over 3,000 employees and provide[s] EMS in five states."[3]

## JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than one or more Defendant.

24.     This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render

---

[3] https://www.superiorambulance.com/about-us/ (last visited June 7, 2024).

the exercise of jurisdiction by this Court just and proper.

25.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) through (d) because: a substantial part of the events giving rise to this action occurred in this District and Defendant has harmed Class Members residing in this District.

## COMMON FACTUAL ALLEGATIONS

### A.     *Defendant Collects a Significant Amount of Private Information.*

26.     Plaintiff and Class Members are current and former patients at Defendant.

27.     Patients, including Plaintiff and Class Members, provided Defendant with their sensitive personally identifiable information and protected health information.

28.     Upon information and belief, in the course of collecting Private Information from patients, including Plaintiff, Defendant promised to provide confidentiality and adequate security from the data it collected from patients through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

29.     Defendant states on its website that: "'[y]our health information is personal, and Superior Air-Ground Ambulance Services, Inc., Superior Air-Ground Ambulance Service of Indiana, Inc., Superior Air-Ground Ambulance Service of Michigan, Inc., and Superior Air-Ground Ambulance Service of Ohio, Inc., and Superior Air-Ground Ambulance Service of Wisconsin, Inc., and Superior Air Ambulance Service, Inc. (collectively Superior Ambulance Service) is committed to protecting it. We are required by law to maintain the privacy of your protected health information (PHI) that could be used to identify you. The law also requires us to provide you with a copy of this Notice of Privacy Practices (Notice), which describes our privacy practices and our legal duties with respect to PHI. Under certain circumstances, we may also be

required to notify you following a breach of unsecured PHI."[4]

30.     Due to the highly sensitive and personal nature of the information Defendant acquires and stores with respect to its patients, Defendant is required to keep patients' Private Information private; comply with industry standards related to data security and the maintenance of their patients' Private Information; inform their patients of its legal duties relating to data security; comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services they provide; and provide adequate notice to patients if their Private Information is disclosed without authorization.

31.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

32.     Without the required submission of Private Information from Plaintiff and Class Members, Defendant could not perform the services it provides.

33.     Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

34.     Defendant's actions and inactions directly resulted in the Data Breach and the compromise of Plaintiff's and Class Members' Private Information.

**B.     *The Data Breach***

35.     On or about May 2024, Defendant posted a notice to its website (the "Notice"), stating the following:

---

[4] *See* https://www.superiorambulance.com/hippa-privacy-policy-1/

> ***What Happened?***
> In May 2023, Superior learned of unusual activity within its
> computer systems. Superior promptly took steps to secure the
> system and began a comprehensive investigation to confirm the
> full nature, scope, and impact of the event. On June 23, 2023, the
> investigation determined that an unauthorized actor copied certain
> files from the network between May 15 and May 23, 2023.
> Superior subsequently worked to undertake a comprehensive and
> time-intensive review of the affected files to identify and catalogue
> what information was present and to whom that information
> relates. Superior then worked to determine contact information for
> those individuals. Superior is now taking steps to notify potentially
> affected individuals of this event.
>
> ***What Information Is Involved?***
> The information that is present in the affected files varies by
> individual but may include: name, address, date of birth, Social
> Security numbers, driver's license or state identification number,
> financial account information, payment card information, patient
> record information, medical diagnosis or condition information,
> medical treatment information, and health insurance information.[5]

36.     Omitted from the Notice were the identity of the cybercriminals who perpetrated

this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and

the remedial measures undertaken to ensure such a breach does not occur again. To date, these

omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a

vested interest in ensuring that their Private Information remains protected.

37.     Although the Notice is lacking in details, it does provide the following: a) that this

Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant's

networks and systems, and downloaded data from the networks and systems (aka exfiltrated data,

or in layperson's terms "stole" data;  and c) that once inside Defendant's network and systems, the

cybercriminals targeted information including Plaintiff's and Class Members' Social Security

---

[5] The "Online Notice." A sample copy is available at
https://about.Defendant.org/news/2024/05/network-interruption-update

numbers, PHI, and other sensitive information for download and theft.

38.     Defendant had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

39.     The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures, and its failure to follow its own policies, in order to protect its patients' PII and PHI.

**C.      Defendant Knew the Risks of Storing Valuable Private Information & the Foreseeable Harm to Victims.**

40.     Defendant was well aware that the Private Information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

41.     Defendant also knew that a breach of its systems—and exposure of the information stored therein—would result in the increased risk of identity theft and fraud (financial and medical) against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

42.     These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem as well as countless ones in the healthcare industry.

43.     PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[6]

---

[6] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited Jun. 6, 2024).

44.    PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.[7]

45.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities.

46.    In 2021 alone, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[8]

47.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years; for instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[9]

48.    The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[10]

49.    Additionally, healthcare providers "store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the

---

[7] *See* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Jun. 6, 2024).

[8] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://go.flashpoint-intel.com/docs/2021-Year-End-Report-data-breach-quickview (last visited Jun. 6, 2024).

[9] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Jun. 6, 2024).

[10] *The healthcare industry is at risk*, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Jun. 6, 2024).

industry a growing target."[11]

50.     Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[12]

51.     The healthcare sector suffered about 337 breaches in the first half of 2022 alone according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[13]

52.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud and more.

53.     As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "[m]edical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[14]

---

[11] *Id.*

[12] *2022 Breach Barometer*, https://www.protenus.com/breach-barometer-report (last visited Jun. 6, 2024).

[13] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited Jun. 6, 2024).

[14] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-

54.     A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market whereas stolen payment card information sells for about $1.[15] According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[16]

55.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an

---

center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Jun. 6, 2024).

[15] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf  (last visited Jun. 6, 2024).

[16] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Jun. 6, 2024).

identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

56.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

57.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

58.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a

freeze on their credit, and correcting their credit reports.[17] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

59.     Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including medical identity theft, credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information.

60.     For example, Social Security numbers, which were compromised in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

61.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual,

---

[17] *See* https://www.identitytheft.gov/Steps (last visited Jun. 6, 2024).

[18] *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jun. 6, 2024).

ongoing fraud activity to obtain a new number.

62.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

63.     There may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused.

64.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[20]

65.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional

---

[19] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft  (last visited Jun. 6, 2024).

[20] *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Jun. 6, 2024).

information.

66.     Based on the value of its patients' PII and PHI to cybercriminals, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

>    **D.     The Data Breach was Preventable.**

67.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

68.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

69.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented numerous measures as recommended by the United States Government, including but not limited to:

- Implementing an awareness and training program.

- Enabling strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scanning all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configuring firewalls to block access to known malicious IP addresses.

- Setting anti-virus and anti-malware programs to conduct regular scans automatically.

- Managing the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.[21]

70.     Given that Defendant was storing the Private Information of its current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

71.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of more than eight hundred thousand individuals, including that of Plaintiff and Class Members.

### E.     Defendant is Obligated Under HIPAA to Safeguard Private Information.

72.     Defendant is required by HIPAA to safeguard patient PHI.

73.     Defendant is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

74.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

75.     Further to 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

---

[21] How to Protect Your Networks from RANSOMWARE, at 3, available at:
https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view
(last visited June 7, 2024).

76.     Under C.F.R. 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

77.     HIPAA requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et. seq*.

78.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[22]

79.     While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

80.     As such, Defendant is required under HIPAA to maintain the strictest

---

[22] *Breach Notification Rule*, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Jun. 6, 2024).

confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

81. Given the application of HIPAA to Defendant, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive healthcare services, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**F. *FTC Guidelines Prohibit Defendant from Engaging in Unfair or Deceptive Acts or Practices.***

82. Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

83. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[23]

84. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities,

---

[23] *Start with Security – A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Jun. 6, 2024)

and implement policies to correct any security problems.[24]

85.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[25]

86.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

87.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

88.     Defendant was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a healthcare provider, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### G.     *Defendant Violated Industry Standards.*

89.     Several best practices have been identified that, at a minimum, should be

---

[24] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jun. 6, 2024)

[25] *Id.*

implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Superior Air-Ground failed to follow these industry best practices, including a failure to implement multi-factor authentication.

90. Other best cybersecurity practices that are standard for healthcare entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

91. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

92. These foregoing frameworks are existing and applicable industry standards for healthcare entities, and upon information and belief, Defendant failed to comply with at least one––or all––of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**H.    *The Monetary Value of Plaintiff's & Class Members' Private Information.***

93. As a result of Defendant's failures, Plaintiff and Class Members are at substantial

increased risk of suffering identity theft and fraud or misuse of their Private Information.

94.     From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identifying fraud is only about 3%.[26]

95.     "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[27]

96.     The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[28]

97.     Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web.

98.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third-party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow

---

[26] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Jun. 6, 2024).

[27] *Id.*

[28] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Jun. 6, 2024).

of information.[29]

99.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[30]

100.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[31]

101.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[32]   The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information.  And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

---

[29] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jun. 6, 2024).

[30] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy* (Feb. 28, 2011), https://www.wsj.com/articles/SB10001424052748703529004576160764037920274 (last visited Jun. 6, 2024).

[31] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Jun. 6, 2024).

[32] Angwin & Steel, *supra* note 34.

102.    Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[33]

103.    The value of Plaintiff's and Class Members' Private Information on the black market is substantial. Sensitive health information can sell for as much as $363.[34]

104.    This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

105.    Health information, in particular, is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[35]

106.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[36]

107.    Medical identity theft can result in inaccuracies in medical records and costly false

---

[33] *See* U.S. Dep't of Justice, *Victims of Identity Theft* (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Jun. 6, 2024).

[34] *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Jun. 6, 2024).

[35] *Id.*

[36] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, https://www.experian.com/innovation/thought-leadership/medical-identity-theft-healthcare-data-breaches.jsp (last visited Jun. 6, 2024).

claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[37]

108.    The Federal Trade Commission has warned consumers of the dangers of medical identity theft, stating that criminals can use personal information like a "health insurance account number or Medicare number" to "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." The FTC further warns that instances of medical identity theft "could affect the medical care you're able to get or the health insurance benefits you're able to use[,]" while also having a negative impact on credit scores.[38]

109.    Here, where health insurance information was among the Private Information impacted in the Data Breach, Plaintiff's and Class Members' risk of suffering future medical identity theft is especially substantial.

110.    The ramifications of Defendant's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for 6 to 12 months or even longer.

111.    Approximately 21% of victims do not realize their identity has been compromised

---

[37] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/ (last visited Jun. 6, 2024).

[38] *What to Know About Medical Identity Theft*, What To Know About Medical Identity Theft | Consumer Advice (ftc.gov) (last visited Jun. 6, 2024).

until more than two years after it has happened.[39] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[40]

112. Indeed, when compromised, healthcare-related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[41]

113. Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft, including medical identity theft, have a crippling effect on individuals and detrimentally impact the economy as a whole.[42]

114. At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful

---

[39] *See Medical ID Theft Checklist*, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited Jun. 6, 2024).

[40] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches* (Apr. 2010), https://www.experian.com/innovation/thought-leadership/medical-identity-theft-healthcare-data-breaches.jsp (last visited Jun. 6, 2024).

[41] Elinor Mills, *Study: Medical identity theft is costly for victims* (March 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited Jun. 6, 2024).

[42] *Id.*

purposes by third parties, such as identity theft (including medical identity theft) and fraud.

115.    Upon information and good faith belief, had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented the ransomware attack into their systems and, ultimately, the theft of the Private Information of patients within their systems.

116.    The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.

117.    Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[43] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[44]

118.    Based upon information and belief, the unauthorized parties have already utilized, and will continue utilize, the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that can be misused.

119.    In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual

---

[43] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, at 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework (last visited Jun. 6, 2024).

[44] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

in ways that were not previously possible. This is known as the "mosaic effect."

120.    Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

121.    Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

122.    Given these facts, any company that transacts business with customers and then compromises the privacy of customers' Private Information has thus deprived customers of the full monetary value of their transaction with the company.

123.    In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

### I.    *Plaintiff & Class Members Have Suffered Compensable Damages.*

124.    For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

125.    The risks associated with identity theft, including medical identity theft, are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

126. In order to mitigate against the risks of identity theft and fraud, Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

127. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

128. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

129. Plaintiff and Class Members now face a greater risk of identity theft, including medical and financial identity theft.

130. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

131. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

132. Plaintiff and Class Members also did not receive the full benefit of their bargain

when paying for medical services. Instead, they received services of a diminished value to those described in their agreements with Defendant. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

133.    Plaintiff and Class Members would not have obtained services from Defendant had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

134.    Finally, in addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

**REPRESENTATIVE PLAINTIFF'S EXPERIENCE**

***Plaintiff Lambkin***

135.    Plaintiff Rochelle Lambkin is a patient of Defendant who started to use Defendant's services in early 2023.

136.    As a condition of obtaining services from Defendant, she was required to provide her Private Information to Defendant.

137.    Upon information and good faith belief, Defendant maintained Plaintiff's Private Information in its systems at the time of the Data Breach.

138.    Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any

other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

139.   Upon information and belief, Plaintiff's Private Information was compromised in the Data Breach.

140.   As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the

141.   impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

142.   Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

143.   Plaintiff additionally suffered actual injury in the form of her Private  Information

being disseminated, on information and belief, on the dark web as a result of the Data Breach.

144.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

145.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

146.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

147.    Plaintiff Lambkin has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

148.    Plaintiff brings this class action on behalf of herself and all other individuals who are similarly situated pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

149.    Plaintiff seeks to represent a Nationwide Class of persons to be defined as follows:

> **All individuals residing in the United States whose PII and/or PHI was compromised in the Defendant's Data Breach which occurred in or about 2023 and was reported by Defendant in April 2024 (the "Nationwide Class").**

150.    Plaintiff seeks to represent an Illinois Subclass of persons to be defined as follows:

> **All individuals residing in the State of Illinois whose PII and/or PHI was compromised in the Defendant's Data Breach which occurred in or about 2023 and was reported by Defendant in April 2024 (the "Illinois Subclass").**

151.    Excluded from the Classes are Defendant, its subsidiaries and affiliates, officers

and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families, all judges assigned to hear any aspect of this litigation, their immediate family members, and those individuals who make a timely and effective election to be excluded from this matter using the correct protocol for opting out.

152. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

153. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes many thousands of individuals, if not substantially more.

154. **Commonality:** This action involved questions of law and fact common to the Class that predominate over any questions affecting solely individual members of the Class. Such common questions include but are not limited to:

    a.    Whether Defendant failed to timely notify Plaintiff and Class Members of the Data Breach;

    b.    Whether Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

    c.    Whether Defendant had respective duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

d. Whether Defendant had respective duties not to disclose the PII and PHI of Plaintiff and Class Members for non-business purposes;

e. Whether Defendant failed to adequately safeguard the PII and PHI of Plaintiff and Class Members;

f. Whether and when Defendant actually learned of the Data Breach;

g. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

h. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI had been compromised;

i. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

j. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

k. Whether Defendant adequately addressed and fixed the vulnerabilities that allowed the Data Breach to occur;

l. Whether Defendant was negligent and that negligence resulted in the Data Breach;

m. Whether Defendant entered into an implied contract with Plaintiff and Class Members;

n. Whether Defendant breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PII and PHI;

o. Whether Defendant were unjustly enriched;

34

p.        Whether Plaintiff and Class Members are entitled to actual, statutory, and/or nominal damages as a result of Defendant's wrongful conduct; and

q.        Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

155.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all patients, or family members or caregivers of patients, of Defendant, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

156.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

157.    **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and have no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

158.    **Superiority and Manageability:** This class action is appropriate for certification

because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

159.    Class action Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

160.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause

of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

161. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

162. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

163. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

164. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

165. Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard patient Private Information; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

166. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

167. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

168. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## CAUSES OF ACTION

### COUNT I
**Negligence**

38

## (*On behalf of Plaintiff & the Nationwide Class*)

169. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

170. Plaintiff brings this claim individually and on behalf of the Class.

171. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

172. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

173. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII and PHI that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

174. Defendant's duty also arose from Defendant's position as healthcare provider. Defendant holds itself out as trusted providers of healthcare, and thereby assumes a duty to reasonably protect its patients' information. Indeed, Defendant was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

175. Defendant breached the duties owed to Plaintiff and Class Members and thus were negligent. As a result of a successful attack directed towards Defendant that compromised Plaintiff's  and Class Members' PII and PHI, Defendant breached its duties through some

combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to their patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

176.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

177.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a.     Theft of their PII and/or PHI;

b.     Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.     Costs associated with purchasing credit monitoring and identity theft protection services;

d.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.  Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.  The diminished value of the services they paid for and received, and

k.  Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

178.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT II**
**Breach of Implied Contract**
**(*On behalf of Plaintiff & the Nationwide Class*)**

179.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

180.    Plaintiff brings this claim individually and on behalf of the Class.

181.    When Plaintiff and Class Members provided their PII and PHI to Defendant, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiff's and Class Members' PII and PHI, comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII and PHI, and to timely notify them in the event of a data breach.

182.    Defendant solicited and invited Plaintiff and Class Members to provide their PII and PHI as part of Defendant's provision of healthcare services. Plaintiff and Class Members accepted Defendant's offers and provided their PII and PHI to Defendant.

183.    Implicit in the agreement between Plaintiff and Class Members and Defendant, was Defendant's obligation to: (a) use such PII and PHI for business purposes only; (b) take reasonable steps to safeguard Plaintiff's and Class Members' PII and PHI; (c) prevent unauthorized access and/or disclosure of Plaintiff's and Class Members' PII and PHI; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or disclosure of their PII and PHI; (e) reasonably safeguard and protect the PII and PHI of Plaintiff and Class Members from unauthorized access and/or disclosure; and (f) retain Plaintiff's and Class

Members' PII and PHI under conditions that kept such information secure and confidential.

184.    When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with their statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and PHI and to timely notify them in the event of a data breach.

185.    Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII and PHI from unauthorized access and disclosure. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

186.    Plaintiff and Class Members would not have provided their PII and PHI to Defendant had they known that Defendant would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

187.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

188.    Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach

189.    The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

a.    Theft of their PII and/or PHI;

b.    Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

190. As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

191. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (1) strength its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) immediately provide and continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## COUNT III
### Breach of Fiduciary Duty
#### (*On behalf of Plaintiff & the Nationwide Class*)

192. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

193. Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

194.     Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

195.     Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

196.     Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII/PHI.

197.     Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

198.     As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>**COUNT IV**</u>
**Invasion of Privacy**
***(On behalf of Plaintiff & the Nationwide Class)***

199.     Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

200.     Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

201.     Defendant owed a duty to its current and former patients, including Plaintiff and

the Class, to keep this information confidential.

202. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII/PHI is highly offensive to a reasonable person.

203. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

204. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

205. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

206. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

207. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

208. As a proximate result of Defendant's acts and omissions, the private and sensitive PII/PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

209.    And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

210.    Unless and until enjoined and restrained by order of this Court,

211.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI are still maintained by Defendant with their inadequate cybersecurity system and policies.

212.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiff and the Class.

213.    In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT V
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 *et seq.* ("ICFA")
### (*On behalf of Plaintiff & the Illinois Subclass*)

214.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

215.    Plaintiff brings this claim individually and on behalf of the Illinois Subclass.

216.    Defendant offered and continues to offer healthcare and other related services in the State of Illinois.

217.    Plaintiff and Class members purchased and received healthcare or other services from Defendant for personal, family, or household purposes.

218.     Defendant engaged in unlawful and unfair practices in violation of the ICFA by failing to, or contracting with companies that failed to, implement and maintain reasonable security measures to protect and secure Plaintiff's and Illinois Subclass members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards.

219.     Defendant makes explicit statements to their patients that their PII/PHI will remain private.

220.     Defendants' duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. Defendant violated this duty by failing to, or contracting with companies that failed to, implement reasonably secure data security policies.

221.     Defendant further violated the ICFA by failing to notify their current and former patients of the data breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

222.     Due to the Data Breach, Plaintiff and Class members have lost property in the form of their PII/PHI. Further, Defendant's failure to adopt, or contracting with companies that failed to adopt, reasonable practices in protecting and safeguarding their patients' PII/PHI will force Plaintiff and Class members to spend time or money to protect against identity theft. Plaintiff and

Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendant's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

223.    As a result of Defendant's violations of the ICFA, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT VI**
**Unjust Enrichment**
**(_On behalf of Plaintiff & the Nationwide Class_)**

224.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein, and pleads the following count in the alternative.

225.    Plaintiff brings this claim individually and on behalf of the Class.

226.    Upon information and belief, Defendant funded its data security measures from its general revenue including payments made by or on behalf of Plaintiff and Class Members.

227.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

228.    Plaintiff and Class Members conferred a monetary benefit on Defendant.

Specifically, they purchased healthcare services from Defendant and/or their agents and in so doing provided Defendant with their PII and PHI.

229.    In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

230.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

231.    In particular, Defendant enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members PII and PHI. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits and the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

232.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by their common law and statutory duties.

233.    Defendant failed to secure Plaintiff and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon Defendant.

234.    Defendant acquired Plaintiff's and Class Members' PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

235.    If Plaintiff and Class Members knew that Defendant had not reasonably secured

their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

236.    Plaintiff and Class Members have no adequate remedy at law.

237.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including:

a.    Theft of their PII and/or PHI;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would

safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.   Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.   Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.   The diminished value of the services they paid for and received; and

k.   Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

238.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

239.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

<u>**COUNT VII**</u>
**Declaratory Judgment and Injunctive Relief**
<u>***(On behalf of Plaintiff & the Nationwide Class***)</u>

148.   Plaintiff restates and realleges all preceding allegations above as if fully set forth

herein.

149.    Plaintiff brings this claim individually and on behalf of the Class.

150.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

151.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff's and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and PHI and remains at imminent risk that further compromises of her PII and PHI will occur in the future.

152.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owes a legal duty to secure patients' PII and PHI and to timely notify patients of a data breach under the common law, Section 5 of the FTC Act, and HIPAA; and

b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

153.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to

protect patients' PII and PHI.

154. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant's properties.

155. The risk of another such breach is real, immediate and substantial.

156. If another breach of Defendant's store of patient data occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

157. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

158. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant [what], thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class, and appointing Plaintiff and her Counsel to represent the Class;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure

of the Private Information of Plaintiff and Class Members;

C.      injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.      an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.      an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.      prejudgment interest on all amounts awarded and

G.      all such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: June 7, 2024                          Respectfully Submitted,

                                             */s/ David S. Almeida*
                                             David S. Almeida (ARDC 6285557)
                                             **ALMEIDA LAW GROUP LLC**
                                             Firm ID 100530
                                             849 W. Webster Avenue
                                             Chicago, Illinois 60614
                                             (312) 576-3024 (phone)
                                             david@almeidalawgroup.com

                                             *Attorney for Plaintiff and the Class*